In the Matter of the Application of Syracuse University, Respondent. State University of New York et al., Appellants; Edmund H. Lewis, as Surviving Executor of John L. Heffron, Deceased, Respondent.

Fourth Department, November 14, 1956.

*Jacob K. Javits, Attorney-General* (*James O. Moore, Jr., Thomas Burke* and *A. W. Feinberg* of counsel), in his statutory capacity under section 12 of Personal Property Law and section 113 of Real Property Law, appellant.

*John C. Crary Jr.,* and *Ruth V. Iles* for State University of New York, appellant.

*Edmund H. Lewis,* as sole surviving executor of John L. Heffron, deceased, respondent in person.

*Bond, Schoeneck & King* for Syracuse University, respondent.

VAUGHAN, J. This is a *cy pres* proceeding, instituted by Syracuse University pursuant to subdivision 2 of section 12 of the Personal Property Law, for an order directing disposition of the income from a bequest to Syracuse University contained in the will of Dr. John L. Heffron, deceased. Named as respondents were the Attorney-General, appearing for unnamed and unknown beneficiaries, the State University of New York, and Edmund H. Lewis as sole surviving executor of the will. Briefly, the bequest was to Syracuse University for purposes of its College of Medicine, which has since been transferred to and become a part of the State University. The executor contends, therefore, that the gift has lapsed and passes by intestacy. The other parties to this proceeding urge that the income from the bequest should be applied *cy pres* to the Medical Center of the State University of New York. The Supreme Court granted an order denying the prayer of the petition, denying a motion to strike the executor's answer, declaring that the gift had failed, and ordering that Syracuse University pay the corpus to Edmund H. Lewis as executor. The Attorney-General and the State University appeal from the order and judgment. Petitioner has not appealed.

Dr. John L. Heffron was for many years one of the leading physicians in Syracuse. His executor testified that Dr. Heffron's "medical education was had at the College of Physicians and Surgeons at Columbia University, and later at the College of Medicine of Syracuse University where he graduated in 1881. Thereafter, he took a post-graduate course, a brief one, in studies in Vienna and medical institutions in Heidelberg. He returned to Syracuse in 1882 and ever since then, until the time of his death in 1924, he was engaged in general practice as a physician in this city. During those forty-two years he was prominent as a general practitioner whose ability was highly regarded State-wide. At various times he served as president of Syracuse Academy of Medicine, the Onondaga Medical Society and the American Academy of Medicine. His deep interest in the College of Medicine of Syracuse University dated from the early years of his practice and never abated. During the fifteen years of his deanship he gave generously of his time and of his effort to its welfare." Dr. Heffron served the Medical School as a professor for 25 years and as dean for another 15 years.

His interest in its welfare is unquestionable, but he was also much concerned with medical education generally and found time to attend to a large practice.

By the tenth clause of his will, which was executed and probated in 1924, Dr. Heffron provided: " I give and bequeath to Syracuse University, provided that within one year after my death the Medical College thereof shall be assured of permanency and of support adequate to keep the same forever in the rank of ' Class A ' medical schools as now classified by the Council on Education of The American Medical Association, and expressed by a written statement to that effect signed by the President and Secretary of the Board of Trustees of said University, Ten thousand dollars ($10,000) or that portion of that amount left after the above bequests are satisfied, to be known as the Roger Williams Pease Memorial Fund, the interest on which shall be paid toward the support of the College of Medicine of said University." The gift was to Syracuse University, the income to be used to support the College of Medicine. A legal trust was not created. There was no separation of legal and equitable ownership. It was an ordinary gift subject to a restriction (*St. Joseph's Hosp.* v. *Bennett,* 281 N. Y. 115). Upon the death of the testator, the gift vested in Syracuse University, which continued to enjoy its benefit for many years. Thus, in spite of the events to be described, the gift has not lapsed, for " A lapsed legacy is one which has never vested or taken effect ". (*Booth* v. *Baptist Church,* 126 N. Y. 215, 242.)

After the bequest had been accepted by Syracuse University and administered for a number of years, financial trouble befell the Medical College. It was operated at a deficit, and the University was anxious to get rid of it. Negotiations were entered into with the State University of New York (Education Law, § 354, subd. 2) and terminated in an agreement, dated June 1, 1950, whereby the State University purchased the physical assets of the Medical College. The agreement provided for a transfer of the endowment funds held by Syracuse University and attributable to the College of Medicine, including " Endowment funds, the income of which Syracuse University agrees to pay to State University for Medical Center purposes, only upon court authorization. It is agreed that these endowment funds generally consist of gifts or bequests to the College of Medicine in name or in purpose, the use of only the income of which is permitted by the instruments creating them." With respect to the same endowment funds it was further agreed that " Syracuse University will make application to a court of competent jurisdiction for an order or orders directing that the

income  \*  \*  \*  be expended, as long as the Medical Center is located adjacent to the campus of Syracuse University, for a purpose or purposes of the Medical Center which in the judgment of the court will most effectively accomplish the general purpose of the instrument creating each such fund ''. Syracuse University was to retain and invest the principal.

Pursuant to this agreement, Syracuse University commenced the present proceeding. The agreement between the two universities, of course, is not binding upon any court which may be called upon to exercise its own discretion in the application of the *cy pres* doctrine.

Section 12 of the Personal Property Law provides, in substance and so far as relevant to this case, that whenever it shall appear to the court that circumstances have so changed since the execution of an instrument containing a bequest to charitable or educational uses as to render impracticable or impossible a literal compliance with the instrument, the court may order that such bequest shall be administered in such manner as in its judgment will most effectually accomplish the general purpose of the instrument, free from any specific restriction contained therein. It is apparent that section 12 is a source of enormous judicial power over charitable gifts, even to the point of disregarding specific directions of the testator, and in deciding whether this case presents an appropriate occasion for the exercise of the power, we must remember that '' where a testator has apparently sought to leave money for a charitable purpose, a liberal construction is to be given to the terms of the will in order to uphold it and validate the bequest '' (*Matter of Potter*, 307 N. Y. 504, 517) — '' the most liberal rules of construction that the law will permit '' (*Matter of Durbrow*, 245 N. Y. 469, 474). These principles of construction are important here because in most *cy pres* cases, involving a search for a general and a particular intention, there is an area of doubt. A leading authority on the law of trusts (4 Scott on Trusts [2d ed.], p. 2832) has stated: '' It is seldom that the testator's intention can be definitely analyzed and divided into a particular and a general intention. It is ordinarily impossible to determine what disposition the testator intended should be made of the property if his particular purpose could not be carried out. Indeed, it is ordinarily true that the testator does not contemplate the possible failure of his particular purpose, and all that the court can do is to make a guess not as to what he intended but as to what he would have intended if he had thought about the matter.'' At page 2844 the same author states that '' where at the time of the creation of the trust it is possible

and practicable to carry out the specific directions of the testator, but in course of time conditions change so that it becomes impossible or impracticable to carry out these directions, the cy pres doctrine is almost invariably applied, and it is rare indeed that the trust is held to fail altogether.''

So we see that the court has great power to preserve and sustain charitable bequests, that it will construe them liberally with that end in view, and that in consequence of the application of these principles '' it is rare indeed that the trust is held to fail altogether ''. Beyond that, '' No general rule can be enunciated as to the manner in which the cy pres doctrine will be applied. Each case must necessarily depend upon its own peculiar circumstances.'' (Matter of MacDowell, 217 N. Y. 454, 466.) However, we believe that certain of the precedents are helpful.

In Sherman v. Richmond Hose Co. (230 N. Y. 462) the testatrix bequeathed $10,000 to '' the Richmond Hose Company to be kept at all times intact and the income derived from the safe and judicious investment thereof to be devoted to the reasonable and proper uses of said company for whatever purposes its members acting as an organization may see fit to direct ''. Thereafter, the City of Batavia was incorporated and assumed responsibility for fire protection. The Richmond Hose Company — named after testatrix' father — then dissolved. The will bequeathed the same fund to named persons if the legacy should '' lapse or fail or for any cause not take effect ''. The court defined a lapsed legacy (at p. 471) as '' one that has never vested or taken effect '' and avoided that clause of the will by construing it as effective only if the gift should lapse as of the death of the testatrix, and not thereafter. The effect of the gift over thus avoided, Judge ANDREWS held the bequest charitable, noting (at p. 468) that '' a trust that tends to reduce taxation and lessen the burdens of government was a charitable use ''. Turning to the cy pres doctrine, Judge ANDREWS stated (at p. 472) that it applied '' not only where a trust existed but where property had been devised or bequeathed to a corporation authorized to take and hold it for charitable purposes ''. This court had awarded the fund in trust to the City of Batavia to be used for fire protection (186 App. Div. 417), and the Court of Appeals affirmed, stating (at p. 473) that the '' exercise of the cy pres doctrine always involves a large measure of discretion ''. The Richmond Hose case, then, involved a gift to a particular company, named in memory of testatrix' father, and no particular purpose was specified in the will. Upon the dissolution of the donee, the fund was applied cy pres to the

City of Batavia for the purpose of fire protection. The facts that the *cy pres* donee was tax-supported and was not named after the father of the testatrix did not require a contrary result. And even the presence of a gift over if the legacy should " lapse or fail or for any cause not take effect " yielded to a construction designed to effectuate a general charitable intent.

The husband of the testatrix in *City Bank Farmers Trust Co.* v. *Arnold* (283 N. Y. 184) had been a noted mural painter. By her will she left her house in London and certain of her husband's paintings to the Royal Academy of Arts for the purpose of establishing a museum. By a deed of trust executed at the same time she provided that " If upon [her] death " the house and objects of art should pass to the Royal Academy, then the sum of £30,000 should be paid to the Academy, the income to be used to maintain the museum. After testatrix' death, estate taxes consumed the real estate, and without any objection the works of art were directed to be given *cy pres* to Yale University for exhibitional and educational functions. The question then arose regarding the disposition of the £30,000. It was held that that gift should also be paid *cy pres* to Yale. The court stated (at p. 193): " The dominant note * * * is her desire to give permanence to her husband's achievements as an artist whose ability found its highest expression in mural painting. But there is clearly manifest an intent by the settlor to promote the style of painting peculiar to her husband's murals * * * the doctrine of *cy pres* was properly applied to effectuate her general purpose." Since in addition to her desire to commemorate her husband as a mural painter, she intended to advance a style of painting, the bequest was applied *cy pres* to promote her general purpose, the particular means which she had directed having become impossible since the execution of the deed of trust. In other words, there was a general desire to promote learning, quite apart from the existence of the particular institution which the testatrix had expected to do the work of education. When establishment of the museum became impossible, application of the *cy pres* doctrine resulted in the substitution of Yale University for the Royal Academy so that art education might continue as the testatrix desired.

*Matter of Gary* (248 App. Div. 373, affd. 272 N. Y. 635) is interesting as showing the extent to which a specific plan of the donor may be judicially altered in furtherance of a general charitable intent. Testatrix had left jewelry and other items to the Metropolitan Museum of Art, to be exhibited perpetually and not to be sold. A sum of money was also given to maintain

the exhibit. The will provided that if the Museum should not accept the legacy on the terms prescribed, then the executors should offer it to alternative beneficiaries. Upon the testatrix' death, the maintenance fund proved insufficient, and neither the Metropolitan Museum nor the alternative beneficiaries was willing to accept on the conditions imposed. The Museum proposed, however, to sell the jewelry to raise money to maintain the remainder of the exhibit, and it was so ordered. That was held by the appellate courts to be a proper exercise of the *cy pres* power. The fact that the testatrix had outlined a scheme with particularity did not preclude a finding of a general charitable intent, and even an express provision of the bequest — that the articles be exhibited perpetually and not be sold — was disregarded. The extent of the departure from the testamentary plan is evident when it is considered that the jewelry, ordered to be sold to augment the maintenance fund, constituted nine tenths of the value of the entire exhibit.

*Matter of Harrington* (243 App. Div. 235) was a construction proceeding. The remainder of a trust fund had been bequeathed to the Rome Hospital for construction of the "Harrington Addition". During the lifetime of the life tenant, the hospital was sold for a nominal consideration to the City of Rome, which continued to operate it. The Rome Hospital was never dissolved and continued to exist for the purpose of administering certain trust funds. The next of kin asserted that to give the fund to the City of Rome "would serve only to ameliorate the tax burden of the property owners of the City of Rome without furthering the charitable ends which the testatrix had in mind". This court held that the gift was charitable and had never lapsed. "A lapsed legacy is one which has never vested or taken effect." The legacy had vested in the Rome Hospital, "which is still in existence and still capable of administering the trust. The very real estate which it formerly owned is now being used as a hospital. What difference that it has changed hands and is now operated by the City of Rome?" And we stated (at p. 239): "If the city of Rome, the present owner of the hospital building in question, does not want an annex or addition substantially as testatrix intended it, it need not have it. But, if it is willing to accept it, no reason is apparent why the wishes of the testatrix cannot be substantially carried out." Having so construed the will, we remitted the matter to Surrogate's Court with the statement that a further proceeding could be had to apply the *cy pres* doctrine. On reargument (245 App. Div. 252) we stated that "this case presents a gift charitable in its nature, and of the kind the Legislature had

in mind when it revived the old *cy pres* doctrine ''. In other words, we held that a bequest of money for the construction of a hospital addition in honor of testatrix' husband was charitable in nature, that the case was within the *cy pres* doctrine, and that if the City of Rome desired an addition to the hospital and the fund proved adequate, then '' no reason is apparent why the wishes of testatrix cannot be substantially carried out ''. The judicial preference for a construction that would sustain a charitable bequest was not displaced by the argument that application of the *cy pres* doctrine '' would serve only to ameliorate the tax burden of the property owners of the City of Rome '', and a different result was not required by the fact that by voluntary conveyance the entire institution which testatrix intended to benefit had passed from private to public control. (See, also, Restatement, Trusts, § 399, comment k; *Matter of Lawless*, 194 Misc. 844, 853; *Matter of Bayside Red Cross League*, 228 App. Div. 719; *Graff* v. *Harrington*, 137 Misc. 712; *Graff* v. *Dunning*, 137 Misc. 715; and *Matter of Syracuse Univ.*, 1 Misc 2d 904, involving the same general problem as the present case, but the *cy pres* doctrine was applied to sustain the gift.)

In view of the above precedents and others which could be cited, we have concluded that the income from the bequest contained in paragraph 10 of the Heffron will should be applied *cy pres*. Of course, we cannot say with perfect assurance that the testator would have so directed had he foreseen the events which have occurred since his death. While he could not have expected Syracuse University and its medical school to remain static, neither could he have anticipated the separation of the latter as an operating unit of the former and its transfer to a public institution which was not in existence when he died in 1924. The question is whether, in addition to Dr. Heffron's desire to benefit the Syracuse medical school (which can no longer be done), he had not a further intent to promote medical or scientific education generally (which can still be done); in other words, whether the medical school was so identified with the motivating purpose of the gift as to be both the means and the end, or was merely the particular instrument preferred by the testator for the attainment of a charitable purpose uppermost in his thoughts. This is much like asking whether he was interested in the school of medicine as a building, as the place where he used to work, or in what was done there to advance the knowledge and ideals of his profession.

As to whether Dr. Heffron intended by his bequest to support medical education, it seems a sufficient reply to say that he devoted a large part of his life to it. The testimony is that he

was deeply interested in medical education generally and had professional interests not connected with the college of medicine. There is certainly nothing in the record to indicate that his concern with scientific knowledge and with the training of members of his profession was limited by the boundaries of Syracuse University; that he was unconcerned with education except as it might occur within the confines of a particular institution. The executor's testimony establishes that Dr. Heffron was not a man of narrow outlook. His own instruction in the science of medicine had been received at four institutions, both here and abroad. While he became closely identified with the Syracuse medical school, he also attended to a large practice and was prominent professionally. It appears from subdivision (a) of paragraph 11 of the will that his father and grandfather were doctors, and he bequeathed their portraits to that grandchild of his who should first become a physician. By subdivision (c) of paragraph 11 he bequeathed to a named doctor his clinical records and certain of his equipment and books. By subdivision (a) of paragraph 9 he left $6,000 to Colgate University to be used in creating two scholarships, one to be awarded to a superior student of science, with a request that a premedical student be given preference. Reading the entire will in the light of Dr. Heffron's life, and remembering the liberal construction which should be given to a charitable bequest, we think it is reasonable to conclude that the testator desired to promote medical education generally and selected (as he naturally would) the Syracuse medical school as merely the particular means through which his broad purpose should be achieved, so that upon the failure of the means the *cy pres* doctrine intervenes to prevent a failure of the purpose.

It will be noticed that paragraph 10 of the will contains no restriction on the purpose of the gift except that the income be applied " toward the support of the College of Medicine of said University ". Beyond that the testator expressed no direction. Of course, the case would be different if the will provided for the construction of a building, the endowment of a chair, the purchase of certain equipment, or the financing of a particular research project. The particular scheme being impossible of attainment, it might then be a question whether anything further was contemplated. But our testator had no particular plan or project in mind. He was content that the income be used to support the college of medicine, which we take to mean the activities and the work of that college. A gift to a charitable donee for its general purposes is a gift to support its corporate and charitable purposes (*Sherman* v.

*Richmond Hose Co., supra*).  No other purpose is expressed in the will, and " So great an absence of particularity is a strong circumstance against the view that the instruction of the testatrix was of the substance of the gift ".  (*Matter of Neher,* 279 N. Y. 370, 374.)

That the testator's underlying concern was with medical education clearly appears from the provision in paragraph 10 which expressly imposed upon the bequest a condition that within one year after his death the medical school " be assured of permanency and of support adequate to keep the same forever in the rank of ' Class A ' medical schools ".  Now if Dr. Heffron's intent was solely to benefit the particular institution with which he had long been associated, he chose a curious way of expressing it.  For on that hypothesis it would seem that the more his alma mater required support, the more willing he would have been to furnish it.  But he said just the opposite: viz., that if Syracuse University would provide a school with a class A rating, then he wanted to leave $10,000 for its general purposes. He wanted his money to be devoted to medical education of the highest quality, but if such training were not furnished by Syracuse University, *then he did not want to support the medical school* and the gift would not take effect.  So we see that the donor's concern with promoting a high quality of medical education was of the very essence of the gift, so much so that if that purpose could not be achieved, then he did not wish to make the gift at all.  Nothing could demonstrate more clearly that he selected the medical school merely as the instrument for achieving a purpose more important to him than any single institution.

There has been in this case no failure of the donee.  Syracuse University continues in existence and is capable of investing the corpus and applying the income as the court may direct. Neither has it become impracticable to achieve the testator's twin purposes: (1) to honor Dr. Pease by creating the Roger Williams Pease Memorial Fund; and (2) to advance, in some suitable way, the knowledge and ideals of the profession to which Dr. Pease and the testator devoted their lives.  If the gift is sustained, both of those purposes will still be achieved and supported, precisely as if the medical school had never been conveyed to the State University, while if the bequest fails, neither purpose will be promoted as the testator intended. That conveyance rendered impossible a literal compliance with the terms of the bequest.  This is a classic case for the application of the *cy pres* doctrine.

The cases cited by the executor are distinguishable. Principal reliance is placed on *Saltsman* v. *Greene* (136 Misc. 497, affd. by this court in 231 App. Div. 781, affd. 256 N. Y. 636). A trust had been created, the income to be applied to repair the building and to beautify the grounds of a Baptist church in the village of Virgil, with the further direction that " no part of said income shall be used to pay salary of any minister ". The named church ceased to exist, and its assets were taken over by the Baptist Missionary Convention. It was held that the *cy pres* doctrine could not be applied to save the gift. The reason is obvious, and we explained it in *Matter of Swan* (237 App. Div. 454, 461, affd. 263 N. Y. 638). The testator contemplated a particular project for a particular church building and specifically directed that the income not be used for another church purpose. His only expressed interest was in a physical structure. There was no general charitable intent, and when attainment of the particular plan conceived by the testator became impossible, the gift failed. In the present case, on the other hand, no particular plan or scheme was contemplated by the testator, who simply directed that the income " be paid toward the support of the College of Medicine of said University ".

*Matter of Merritt* (280 N. Y. 391, 399) may be distinguished in the same way. The testator clearly had no general charitable intent. Indeed, the court left open the question whether a gift to a public cemetery is charitable at all. The testator desired to set up a certain institution on a particular piece of land, where a family cemetery was already maintained, and to continue that particular institution in perpetuity. Before the trust was set up, creditors had taken the farm and the fundamental purpose could not be carried out. Therefore, the direction to apply the balance of the estate toward the maintenance of the cemetery also failed. The testator envisioned a very specific project, even so far as authorizing the construction of certain burial vaults. As RIPPEY, J., stated: " A reading of the will exhibits a clear and unqualifiedly expressed intention on the part of the testator to restrict his gift * * * to the planning, laying out, building and subsequent use of a particular property and for a particular purpose ".

In *Matter of Fletcher* (280 N. Y. 86, 90) there was an express gift over if the bequest should " *for any reason, be declared illegal* or *inoperative* ". That negatives a general charitable intent. Where the testator has named his own alternative donee or beneficiary, no court can substitute another. As the court stated in *City Bank Farmers Trust Co.* v. *Arnold* (283 N. Y.

184, 194): " We are not unmindful of the rule in *Matter of Fletcher* (280 N. Y. 86). But there, unlike the present case, there was no evidence of a general charitable intent by the donor and the will contained a definite provision for a gift over to a named beneficiary." There is no provision for a gift over in the Heffron will, and none can be implied.

We conclude that the *cy pres* doctrine applies to the facts of this case, and that the income from the Roger Williams Pease Memorial Fund should be disbursed by the petitioner for a purpose as near as may be to that particularly contemplated by the decedent. As the Supreme Court regarded the *cy pres* doctrine as inapplicable and dismissed the petition for that reason, that court's discretion in the matter has not been exercised. Neither are there any findings regarding a suitable and proper *cy pres* purpose, and we do not wish to be understood as expressing an opinion on the question. Following our practice in *Matter of Harrington* (243 App. Div. 235), we must remit the matter to the lower court for the exercise of its discretion and the application of the *cy pres* doctrine.

The order and judgment must be reversed and the matter remitted to the Supreme Court for further proceedings in accordance with this opinion.

All concur. Present — VAUGHAN, J. P., WHEELER, WILLIAMS and BASTOW, JJ.

Judgment and order reversed on the law, without costs of this appeal to any party, and matter remitted to the Special Term for further proceedings not inconsistent with the opinion.